WATROUS *v.* BIALY'S ESTATE.

1. GUARANTY—CONDITIONAL GUARANTY—LIABILITY OF GUARANTOR.
    Where it appears that corporate stock was turned over
    to H. as his absolute property to compensate him for
    the payment of a note upon which B. was jointly liable,
    and B. executed an agreement guaranteeing the value of
    the stock on a specified date, whether or not B. was liable
    on his contract of guaranty depended on the value of the
    stock on said date.

2. SAME—EVIDENCE—BURDEN OF PROOF.
    On a claim against B.'s estate on said contract of
    guaranty, the burden of proof to establish the value of
    the stock on the specified date was on plaintiff.

3. EVIDENCE—CORPORATE STOCK—OPINION EVIDENCE AS TO VALUE
    —WITNESSES.
    The value of corporate stock which has no market value
    is best shown by opinion evidence of those who have
    knowledge of the elements which go to make up the
    value.

4. WITNESSES—OPINION EVIDENCE—SHOWING OF BASIS FOR OPINION
    QUALIFIES WITNESS.
    A witness whose testimony showed that she had some
    knowledge on which to base an opinion as to the value
    of corporate stock was competent to express an opinion
    thereon.

Error to Bay; Houghton (Samuel G.), J.     Sub-
mitted October 18, 1922.     (Docket No. 122.)     De-
cided March 22, 1923.     Rehearing denied June 21, 1923.

James R. Watrous, executor of the last will of
Carolyn P. Hawley, and general guardian of Kathleen
and Carolyn R. Hawley, minors, presented a claim
against the estate of Robert C. Bialy, deceased, for

an amount due on a written contract. The claim was ·allowed by the commissioners, and defendant appealed to the circuit court. Judgment for plaintiff on a directed verdict. Defendant brings error. Reversed.

*Kinnane & Leibrand,* for appellant.

*Edward S. Clark,* for appellee.

McDonald, J. The plaintiffs were allowed a claim of $39,162.42 against the defendant estate in the probate court for Bay county. An appeal to the circuit court resulted in a directed verdict for the plaintiffs in the sum of $40,602.72. The defendant appeals. In 1916, Charles R. Hawley and Robert C. Bialy, both now deceased, were interested in the Nevada Sugar Company of Fallon, Nevada. In 1913, the company made a loan of $25,000 from the National Park Bank of New York City. As security it pledged its stock, and the directors, among whom were Hawley and Bialy, signed a written guaranty for the payment of the note. When the note matured the company was in the hands of a receiver. Hawley paid it and no contribution was made to him by the other guarantors. Later, but at what time and for what reason the record does not show, Bialy guaranteed to protect Hawley from any loss on account of the payment of this note. In addition to the transaction relating to the note, Bialy and Hawley were jointly indebted to the Peoples State Bank and the Peninsular State Bank of Detroit, and had deposited with these banks certain securities as collateral to their loans. This indebtedness was past due and unpaid. Foreclosure proceedings were begun. Hawley and Bialy hastened to Detroit and while there entered into an agreement, in writing, on the 3d day of June, 1916, the apparent purpose of which was to define their

interest in the stocks and bonds which they held in common, to further protect Hawley against loss for the amount paid by him on the National Park Bank note, and by depositing other securities with the two Detroit banks to secure an extension of time for the payment of that indebtedness.    At that time the indebtedness on account of the National Park Bank note, including interest, amounted to $30,536.    After the foreclosure sale of the property of the Nevada Sugar Company, a new company, known as the Nevada-Utah Sugar Company, was organized and bonds and stock of the new company were issued to Hawley and Bialy.    It is the stock of this company that is referred to in the contract which, as far as it relates to the question in controversy, reads as follows:

"The $30,540 of stock provided for to be delivered to Charles R. Hawley is delivered to him as collateral to the obligation on the note of the National Park Bank of New York City the payment of which has heretofore been guaranteed by said Robert C. Bialy to said Charles R. Hawley, and which note has been taken up and paid by Charles R. Hawley, and in addition to this $30,540 there shall be delivered to Charles R. Hawley the certificate of stock of $22,470 issued in the name of Robert C. Bialy which is to be retained by said Charles R. Hawley as additional collateral to the obligation of said Robert C. Bialy as aforesaid, in addition to the collateral now held by said Charles R. Hawley as indemnity for said debt.

"Robert C. Bialy obligates himself to pay to Charles R. Hawley the sum of $30,536 with interest at 6 per cent. per annum on or before January 1, 1918. If said Charles R. Hawley on January 1, 1918, can realize from the sale of the $30,540 of stock allotted to him or any part thereof sufficient to pay said amount of $30,536 with interest, then he shall return to said Robert C. Bialy the $22,470 of Nevada-Utah stock, which has been deposited with him as collateral security, or in the event that said Robert C. Bialy shall tender to the said Charles R. Hawley the sum of $30,536 with interest on or before January 1, 1918,

then said Charles R. Hawley may, at his option, retain the stock or sell it to said Robert C. Bialy for the sum of $30,536, and upon the making of said tender the lien upon the stock issued in the name of Robert C. Bialy, for the $22,470 of stock shall cease and determine, and the stock shall be delivered to him, but it is expressly understood between the parties that if said $30,540 of stock shall, on the 1st of January, 1918, be worth more than the sum of $30,536, the said Robert C. Bialy shall have no interest in the excess - value of said stock, and same shall belong to Charles R. Hawley, and thereupon the indorsement of Robert C. Bialy on said National Park Bank note shall be canceled and the indemnity agreement heretofore delivered to Charles R. Hawley by Robert C. Bialy shall also be cancelled, so far as that indemnity covers the National Park Bank note."

Out of this contract arises the claim involved in this suit. The plaintiff contends that the obligation of Mr. Bialy was an absolute and unconditional promise to pay $30,536 on or before the 1st day of January, 1918. The defendant claims that it was a conditional promise depending on the value of the stock on the 1st day of January, 1918.

For a better understanding of the contract reference should be made to the history of the $30,540 block of stock. The property of the Nevada Sugar Company was bought on a mortgage sale for $1,000 by Mr. Oxtoby as trustee for the bond holders. Mr. Hawley had paid the National Park Bank note and to that extent was a creditor of the Nevada Sugar Company at the time of the sale. As such, he received $320.19, that being his *pro rata* share of the proceeds of the sale. This was in January, 1916. The sale was made as a part of the plans to reorganize the company. Then Mr. Oxtoby arranged a sale of the property to a new company to be· known as the Nevada-Utah Sugar Company. In this reorganization the Utah-Idaho Sugar Company, a financially

sound and successful corporation, was given a majority of the stock and was to operate the business. The bonds and the balance of the stock for the most part were divided by the trustee among the bond holders, stockholders and creditors of the old company. As creditor, on account of the payment of the National Park Bank note, there was allotted to Mr. Hawley by the trustee this $30,540 of stock. This was on the 2d of June, 1916, and on the following day the contract in question was made in which the allotment of the stock to Hawley and to others by the trustee was approved and ratified, so that when the contract was made the $30,540 of stock did not belong to Bialy but was the property of Hawley. As to that fact the record is undisputed. The stock was issued to him. The title was in him, and the contract shows that he proposed to retain it unless the stock depreciated in value or became worthless, in which event the contract gave him a right to unload it on Bialy. Having in mind the fact of the ownership of this $30,540 of stock, it is not difficult to understand the unusual and seemingly unreasonable provisions of this contract. The language of the contract and every provision as to the handling and disposition of the collateral is in harmony with the ownership by Hawley. That Bialy was to have no interest in the excess value of the stock if it went above par, that he could not get the stock back even though he paid or tendered the full amount of the indebtedness, that if payment were tendered Hawley might, at his option, retain the stock or "sell it to Bialy" for the sum of $30,536, all becomes plain when it is understood that Hawley was the real owner of the stock and that Bialy's part in the transaction was to protect Hawley from loss in the event that the stock went below par. The stock had been given to Hawley as a creditor of the old Nevada Sugar Company, because he had paid

the National Park Bank note. Bialy had guaranteed to Hawley the payment of this note. That was the situation when the contract was made on the 3d day of June, 1916. Considered in connection with the history of the $30,540 of stock and its relation to the National Park Bank note, it clearly appears that the main purpose of the contract was to secure Hawley from loss if the stock went below par or became worthless, and that Bialy was to be released if it went above par. That is what the parties meant when they said:

"But it is expressly understood between the parties that if said $30,540 of stock shall, on the 1st of January, 1918, be worth more than the sum of $30,536, the said Robert C. Bialy shall have no interest in the excess value of said stock, and same shall belong to Charles R. Hawley, and thereupon the indorsement of Robert C. Bialy on said National Park Bank note shall be canceled and the indemnity agreement heretofore delivered to Charles R. Hawley by Robert C. Bialy, shall also be canceled, so far as that indemnity covers the National Park Bank note."

Mr. Bialy's undertaking was not an absolute promise to pay unconditionally and at all events the amount specified in the contract, but was a conditional promise depending on the value of the stock on the 1st day of January, 1918. If the $30,540 of stock were above par at that time, Bialy was not liable. If it were below par, he was liable. In this view of the contract the value of the stock on the 1st day of January, 1918, becomes a very material element in the case.

The burden of proof was with the plaintiff to establish its value on that date by a preponderance of the evidence.

The circuit judge refused to submit the question as to the value of the stock to the jury, because in his construction of the contract it was not material,

and if it were material, there was not sufficient competent evidence to justify him in submitting it. Whether this was error depends largely upon the competency of the testimony of Mrs. Bialy.     The court permitted her to testify as to the value of the physical property of the company, but excluded her testimony as to the value of the stock.     If she knew the value of the property she had some knowledge of the value of the stock.     It had no market value.     The value of such stock is best shown by opinion evidence of those who have knowledge of the elements which go to make up the value.     The value of the corporate property, whether it was a going concern carrying on a prosperous or a failing business, the price of sugar and the character of the surrounding territory as to its adaptability for the raising of sugar beets in sufficient quantity to enable the company to operate successfully, all were elements which could properly be considered in estimating the value of the stock. Of these Mrs. Bialy testified:

"I spent considerable time in Nevada at the office of the company during the time that my husband was actively engaged in the work of the company there * * * know the different parts of the factory, have been through it all as well as the surrounding county at Fallon.    *    *    *    The factory was all in first class condition.     Buildings were all concrete, stone and brick.     I have also been interested in sugar stock.     I have owned stock in the Utah-Idaho Sugar Company as did also my husband.

"My husband's business was hardware, farm implements, machinery, etc., at Bay City, and also real estate' owned principally by Mr. Bialy.     A large part of the machinery that went into the Nevada Sugar factory was made in Bay City and Mr. Bialy handled a large part of it.     I have worked in connection with Mr. Bialy for several years, doing correspondence and working on the books and in connection with sales and details, was a joint owner

with him in much of the property and of the real estate. * * *

"On the 1st of January, 1918, we were in the midst of the war and the price of sugar was going as high as the government would allow it to go.    I am acquainted with the beet fields and lands around Fallon and tributary to it and there was plenty of land and good supplies for beets.    There is plenty of land out there and the sugar beets have a larger percentage of sugar than in any other State in the United States.

"Q. State, if you know, the value of the stock of the Nevada-Utah Sugar Company on the 1st of January, 1918?

"Mr. Clark: Same objection.    This witness is not competent to answer, and it is immaterial.

"The Court: Objection sustained.

"Mr. Kinnane: The court has in mind that she has dealt in sugar stock in the west and had knowledge of the factory and property?

"The Court: Yes.

"Mr. Kinnane: And a knowledge of beet growing there, and the quantity, and everything else in connection with it.    I would like to repeat that question so as to make the record clear, not that we are disputing the ruling, but on the question here.    Now, I want to ask this question:

"Q. State whether or not you know what the value of the sugar company stock was on the 1st of January, 1918?

"A. Yes.

"Q. State then what its value was.

"Mr. Clark: I object to that, your honor, as before.

"The Court: Sustained."

We think the testimony of Mrs. Bialy shows that she had some knowledge on which to base an opinion as to the value of the stock.

As was said in Continental Ins. Co. v. Horton, 28 Mich. 173:

"On this evidence she had some knowledge of values which it was proper she should communicate to the jury."

And in *Graves* v. *Kennedy*, 119 Mich. 621:

"It is true, as contended, that before the testimony of a witness is receivable, it must appear that the witness has a knowledge of the subject which the jury do not possess, which enables him to give an opinion which will be of aid to the jury."

"While witnesses are not required to be expert or skilled in the strict and severe sense of the term in order to give opinions on value, and while there is no inflexible rule defining how much a witness must know in order to be so qualified, it must be made to appear that he has had, and utilized, means superior to those available to the jurors, for forming an intelligent opinion."    22 C. J. p. 578, § 682.

Measured by these tests, Mrs. Bialy had sufficient knowledge upon which to base her opinion as to value. The extent of that knowledge and the probative weight to be given to her opinion was a question for the jury.    The circuit judge erred in directing a verdict for the plaintiff.

For this error the judgment is reversed and a new trial granted.    Defendant will have costs.

WIEST, C. J., and FELLOWS, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.    MOORE, J., did not sit.